0

**United States District Court**

**District Court of Rhode Island**

2021 MAY 39  A II: 42

**Nicholas J. Pepper,**

*Plaintiff,*

**V.**

**Brown University and**

**Sheila Coleman (**in her individual/official capacity as Director of Human Resources)

*Defendants*

## Complaint

1. This complaint arises out of allegations of Disparate Treatment, Disability Discrimination, Harassment, Retaliation, and Faliure to Provide a Reasonable Accomodation.

## Jurisdiction

2. This court has jurisdiction over Plaintiff's Federal law claims arising under the American with Disabilities Act of 1990 ("ADA") and Sections 503 and 504 of the Rehabilitation Act of 1973 ("The Rehabilitation Act") pursuant to 28 U.S.C. S 1331.

3. This court has supplemental jurisdiction over the state law claims pursuant to U.S.C.  S 1367 because these claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution."

## Venue

4. Venue is proper in this district pursuant to 28 U.S.C. S 1391 because a

0

5. substantial part of the events and/or omissions giving rise to this claim occurred in this judicial district and because Brown conducts business in this district.

**Parties**

6. Plaintiff, Mr. Nicholas J. Pepper ("Mr. Pepper") is a citizen of the United States and a resident of North Providence, Rhode Island.

7. Mr. Pepper has a disability(s) and/or impairment(s) which limit one or more major life activities, including (but not limited to); thinking, learning, reading, hearing, concentrating, communicating, and sleeping.

8. Defendant Brown University ("Brown") is a non-profit corporation with a principal place of operation in Providence, Rhode Island

9. Brown is an employer as defined by 42 U.S.C. S 12111 and is therefore subject to the requirements of the Title I of the ADA.

10. Brown is an employer as defined by the **Rhode Island Fair Employment Practices Act "FEPA" RI Gen Law 28-5-7** and is therefore subject to the requirements of **FEPA/RI Gen. Law 28-5-7** *et. seq* and the provisions of the **Rhode Island Civil Rights Act** of 1990 ("RICRA") RI Gen. Laws 42-112-1 *et. seq.* and the **Civil Rights of People with Disabilities Act "RICRDA"  RI Gen. Laws 42-87-1 *et. seq.***

11. Brown operates programs, services, and activities receiving federal funds and is therefore subject to the requirements of **Section(s) 503 and 504 of the Rehabilitation Act of 1973,  29 U.S.C S 701, *et. seq.***

12. Defendant, Ms. Sheila Coleman ("Ms. Coleman") is a resident of Rhode Island

1

and was, at all time relevant to this complaint, Brown's Director of Human Resources and, in that capacity, had managerial and supervisory authority over the Plaintiff as defined by **FEPA/RI Gen. Law 28-5-7**.

**Statement of Facts: Introduction**

13. Mr. Pepper was an employee of Brown University Dining Services ("Brown") from September of 2017 until December 13, 2019.

14. Mr. Pepper has physical and/or mental impairments as defined by the **ADA/FEPA /RI Gen Law 28-5-7, RICRA/RICRPDA** and/or a record of such impairment(s), which substantially limit one or more major life activities and is therefore entitled to the protections under the Americans with Disabilities Act of 1990 (ADA), the Rehabilitation Act of 1973, and the corresponding applicable State Disability Laws

15. Plaintiff struggles with Hypervigilance, an exaggerated physiologic response to sensory stimuli.

16. Hypervigilance is a symptom of both ADHD and Generalized Anxiety Disorder.

17. Hypervigilance is characterized by an exaggerated "Startle Reflex," (aka the "Fight or Flight Reflex"), commonly referred to as being "jumpy."

18. Plaintiff's Hypervigilance manifests (most noticeably) as Hypersensitivity to sound waves.

19. Plaintiff was continually subjected to Discrimination, Harassment, Hostile Work Environment Conditions and Retaliation based upon his percieved and/or actual Disability by coworker, Mr. Tony Fernandes ("Mr. Fernandes.")

20. Mr. Fernandes is a notorious Workplace Harasser among both Brown Dining

Services Supervisors and Employees.

21.  Plaintiff was targeted and harassed specifically based upon (symptoms) of his Disability (more specifically, Hypervigilance).

22.  Discrimination and Harassment to which plaintiff was subjected was both Severe and Pervasive and, ultimately altered the terms and conditions of his employment.

23.  Plaintiff never welcomed or solicited any of the Discrimination or Harassment to which he was subjected.

24.  Plaintiff made complaints to numerous departments regarding the Unlawful Harassment and Discrimination, (both verbally and in writing), to no avail.

25.  After his complaints, the plaintiff was subjected to additional Retaliatory Harassment.

26.  Upon information and belief, plaintiff was treated less favorably than similarly situated employees and was subjected to Unequal Discipline and Biased Policy Enforcement.

27.  Defendant Brown also Unlawfully Refused to provide plaintiff with a Reasonable Accommodation and continuously Refused to Engage in the Interactive Process.

28.  Brown's Supervisors, HR staff, and Office of Institutional Equity and Diversity failed to adequately investigate and/or exercise corrective actions in response to plaintiff's complaints and/or reports of Unlawful Harassment.

29.  Brown also failed and/or refused to abide by its own Policies and Procedures including, (but not limited), Brown's Anti Harassment /Anti-Discrimination and NonRetaliation Policies, and as well as Brown's *purported* Reasoable

Accomdation Policy.

30. Brown's Representatives made statements (under oath) to the Rhode Island Commission for Human Rights ("RICHR"), which Brown knew and/or should have known were false, with actual malice, and the intent to cause harm to Mr. Pepper and/or Mr. Pepper's reputation, in violation of **Rhode Island General Laws Title 11: Criminal Offenses § 11-33-1. Perjury**

31. Additionally, (Brown Deputy Counsel**)** Ms. Kathleen C. Peterson made and/or published statements to the RICHR that she knew and/or should have known were false, in direct violation of: **American Bar Association (ABA) Rule 3.3: Candor Toward the Tribunal**

**(a)** *A lawyer shall not knowingly***:**

*(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer*

*(2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or*

*(3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false.*

*(b) A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.*

*(c) The duties stated in paragraphs (a) and (b) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by **Rule 1.6**.*

*(d) In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse.)*

32. Discrimination, Harassment, and Retaliation plaintiff was subjected to includes, (but is not limited to), that set forth in the paragraphs below.

Facts

33. Plaintiff began working for Brown as a Temporary Food Service Worker in September of 2017.

34. In or around September of 2018, plaintiff was offered and accepted a position as a permanent, full-time Food Service Worker with Brown.

35. In or around November of 2018, Mr. Pepper notified (Brown Director of Residential Dining Services) Ms. Claire Sidla and (Dining Services Supervisor) Ms. Katherine Harrop, of his ADHD Diagnosis during a monthly Employee Performance Review.

36. With regards to his impairment(s), Mr. Pepper informed Brown that, although he did not require a specific accommodation *at the time,* he may need to have instructions repeated to him several times.

37. Mr. Pepper also emphasized that he felt it was important to disclose this information should the need for Reasonable Accommodation arise in the future.

38. Additionally, Mr. Pepper notified and/or reminded Bon Appteit/Brown Supervisor Ms. Tara Norcross of ADHD Diagnosis during his Final Employee Probationary Review, in or around May of 2019.

39. In or around May of 2019, Mr. Pepper also requested that Ms. Norcross relay information of his ADHD Diagnosis to Brown Supervisors and/or Management Team to facilitate better communication.

40. Approximately one week later, Ms. Norcross followed up with the plaintiff to confirm she had relayed said information to Brown's Management Team and/or Supervisors

41. Food Service Worker Mr. Tony Fernandes ("Mr. Fernandes") began Harassing the plaintiff shortly after the plaintiff was hired as a full time employee in September of 2018.

42. Mr. Pepper initially declined to report the Harassment to Brown's Management Team due to fear of Retaliation.

43. In or around the spring of 2019, Mr. Fernandes's Harassment of the plaintiff began *escalating* shortly after Mr. Fernandes appeared to have caught on to one of the symptoms of plaintiff's medical condition(s) (Hypervigilance).

44. Prior to the onset (and escalation) of Mr. Fernandes's Harassment, the plaintiff's

symptoms were relatively mild and infrequent.

45.  In or around the spring of 2019, Mr. Fernandes commenced an Unrelenting Campaign of Harassment of the plaintiff, which continued for the duration of plaintiff's employment with Brown

46.  In or around spring of 2019, plaintiff noticed a peculiar incident that began to repeat itself with increasing frequency; Whenever the plaintiff would have his back turned to an open space and was fully engaged in and concentrating on his work, (such as when wiping down tables in the dining room, cleaning a service counter, ect.), when, upon completion of his task, plaintiff would turn to walk away, he would find Mr. Fernandes perched right behind him, standing uncomfortably close, for no apparent reason.

47.  Mr. Fernandes would often be standing so close that the plaintiff would walk right into him.

48.  Mr. Fernandes would often laugh at the Plaintiff before sarcastically apologizing and walking away.

49.  In or around late spring of 2019, the Plaintiff realized that Mr. Fernandes had begun following him around the building and attempting to trigger the plaintiff's Hypervigilance by way of various tasteless and degrading "pranks."

50.  These derogatory "pranks" were primarily centered around triggering a symptom of plaintiff's medical condition (Hypervigilance), by sneaking up behind him and attempting to startle him by;

a.  Screaming directly into his ear

b.  Slamming a metal pan on a table behind plaintiff and/or

7

c. *Aggressively grabbing plaintiff from behind*

51. This behavior continued *in spite of plaintiff's repeated and insistent request that Mr. Fernandes keep his hands to himself.*

52. The Harassment continued to escalate in frequency throughout the months of June and July of 2019.

53. Plaintiff was not scheduled to work the month of August 2019 due to the summer break (and his Union contract/designated working group).

54. Mr. Pepper returned to work on or around September 1, 2019.

55. Upon returning to work, the Harassment resumed immediately and rapidly escalated to unprecedented levels (with regards to frequency, intensity, and duration).

56. *In the presence of other Employees, Mr. Fernandes continuously mocked and ridiculed the plaintiff based upon symptoms of plaintiff's Disability.*

57. Upon information and belief, Mr. Fernandes made a concerted effort to point out this symptom of plaintiff's impairment (Hypervigilance) to numerous Brown Dining Service Employees, saying things like;

a.) *"Watch me scare the s\*\*\* out of Nick!!!" Watch how much he jumps when I grab him!! "* and,

b.) *"Hahaha, yeah, Nick, the big tough guy that is scared of loud noises and he jumps a mile every time you touch him!!! Hahaha!! Let's go mess with this guy!!"* immediately prior to initiating one of his egregious "pranks".

58. *In the presence of other employees , Mr. Fernandes continued to put his hands on Mr. Pepper, in spite of Mr. Pepper's **repeated requests that Mr. Fernandes***

8

***keep his hands to himself.***

59.  Plaintiff's symptoms were *severely exacerbated* due to the continuous Discriminatory Harassment.

60.  In September of 2019, plaintiff began experiencing numerous medical complications, directly related to the Discriminatory Harassment, including (but not limited to):

a.  Frequent chest pains

b.  Anxiety

c.  Confusion and

d.  Disorientation and

e.  Extreme sleep disturbances (all in **Direct Chronological Correspondence** with the Escalating Harassment).

61.  Upon information and belief, Mr. Fernandes also actively solicited other employees and encouraged them to join him in his Relentless Campaign Harassment, saying things like;

A.)  *"Go up and grab Nick's shoulder and watch him jump!!! Hahaha!!"* and

B.**)**  ***"Sneak up behind Nick and scream his name in his ear and watch him almost have a heart attack!!! Hahaha!!! Let's go mess with this guy!"***

62.  Once the plaintiff had independent confirmation that he was being targeted specifically based upon (symptoms of) his Disability and/or impairment(s), he wrote up an extensive email listing numerous details of the Harassment, along with the specific details of his medical condition(s).

63.  Plaintiff also listed several disturbing examples of Mr. Fernandes's Harassment

of other Brown employees, including,(but not limited to);

64.  One particularly disturbing incident which had taken place several months prior, in which Mr. Fernandes attempted to poison a coworker, (Mr. Hernani Boventura) by tricking him into ingesting an OTC medication (Benadryl), to which Mr. Fernandes knew Mr Boventura was particularly sensitive.  Mr. Fernandes offered the OTC medication to Mr. Boventura upon seeing him struggling with allergies, claiming it was a non drowsy allergy medication, (a Zyrtec or Claritin equivalent), which Mr. Fernandes had retrieved from the University's first aid kit. Approximately, one hour hour later, Mr. Boventura noticed a strange, woozy lightheaded feeling coming over him; he also noticed Mr. Fernandes sporting an obnoxious smirk.  Mr. Fernandes then went on to gleefully inform Mr. Boventura that  he had indeed given him benadryl, in spite of Mr. Boventura's warning of his extreme sensitivity to said medication.

65.  Upon information and belief, Mr. Fernandes then proceeded to taunt and mock Mr. Boventura for the duration of the evening, as Mr. Boventura became extremely light-headed and struggled to maintain consciousness.

66.  On October 6, 2019, plaintiff forwarded the aforementioned email (**Exhibit 1)** to his Union Steward, Ms. Tanissa Stone ("Ms. Stone.")

67.  On October 7, 2019, Mr. Pepper met with Brown Dining Services Supervisor Ms. Jean Couto ("Ms. Couto") and Brown/Bon Appetit Supervisor, Ms. Tara Norcross ("Ms. Norcross"), to address his concerns regarding the Unlawful Harassment.

68.  During the October 7, 2019 meeting, the plaintiff informed Brown that:

a.  He was being Harassed by Mr. Fernandes specifically based upon symptoms of

his Disability

b. the Harassment had been going for (*at least*) 6-8 months

c. Mr. Fernandes was intentionally and repeatedly triggering a physiologic symptom of plaintiff's impairment, (plaintiff's overactive "Fight or Flight" Reflex), simply for Mr. Fernandes's own amusement

d. The Harassment had caused an extreme exacerbation of the plaintiff's pre-existing medical symptoms, as detailed above (chest pains, tachycardia, confusion, disorientation, ect.)

69. During the October 7, 2019 meeting, plaintiff also informed Brown that:

a. he feared that the Harassment was putting him at an elevated risk for stroke and/or heart attack

b. Plaintiff had a family history of cardiac disease

c. Plaintiff expressed urgent fear for his safety and

d. Plaintiff also relayed his Prescribing Psychiatrist's recommendation that he should be separated from Mr. Fernandes.

70. Additionally, Plaintiff notified Brown of the extreme sleep disturbances he had begun experiencing (with the onset of the Harassment), along with the corresponding adjustments to his medication therapy necessitated due to the exacerbation of his pre existing symptoms.

71. Also, during the October 7, 2019 meeting, plaintiff notified Brown that, in addition to the incidents of Harassment described above, *Mr. Fernandes had even begun following the plaintiff into the men's bathroom to pester and provoke the plaintiff with his absurd pranks.*

72. The plaintiff then went on to describe a particularly disturbing incident in which he had caught Mr. Fernandes hiding behind a wall, just outside the men's bathroom, perched, waiting to jump out and startle the plaintiff. Although Mr. Fernandes abandoned his prank once he realized that the plaintiff had seen him out of his peripheral vision, Mr. Fernandes then proceeded to follow the plaintiff into the restroom before asking him, *"Oh, you saw me standing there, huh?"* with a childish laugh.

73. Mr. Fernandes acknowledged that the plaintiff had caught on to his tasteless prank and, upon seeing plaintiff's clear anger and frustration, Mr. Fernandes proceeded to laugh and taunt the plaintiff before exiting the men's bathroom.

74. During the October 7, 2019 meeting, the plaintiff warned his supervisors that he was, *"On the verge of losing my temper and attacking Tony (Fernandes),"* at that very moment (approximately one week prior).

75. The plaintiff informed his supervisors, however, that he did not report the incident immediately because he was worried that the nature of Harassment, combined with his impairments would, *"Make me look like a crazy person."*

76. Both Ms. Couto and Ms. Norcross assured the plaintiff that this would not be the case ***and that he would not be treated any differently because of his impairments.***

77. Ms. Norcross further remarked that she knew that, *"Tony (Fernandes) likes to play around,"* and that, *"I wonder if maybe he thinks he's just joking with you."*

78. Ms. Norcross also acknowledged that Mr. Fernandes's behavior was, *"Not only unacceptable, but illegal."*

79. Additionally, during the October 7, 2019 meeting, Mr. Pepper also informed his Supervisors that he had previously declined to report Mr. Fernandes's Harassing behavior because he feared that Mr. Fernandes would inevitably **Retaliate**. Both Ms. Couto and Ms. Norcross assured the plaintiff that, *"Brown does not tolerate Harassment or Retaliation of its employees."*

80. Furthermore, the plaintiff is *specifically instructed* to report any additional incidents of **Harassment** and/or **Retaliation** to either Ms. Norcross or Ms. Couto. Plaintiff is assured that any such reports will be addressed promptly and appropriately.

81. Also on October 7, 2019, during his initial verbal complaint, Mr. Pepper also *Requested a Reasonable Accommodation (1st contact/ Attempted Request).*

82. Brown Supervisors, however, informed the plaintiff that they could *not* assist him in acquiring a **Reasonable Accommodation** and that he *must* contact **Brown University Disability Services** if he desired and/or needed an Accommodation.

83. During the October 7, 2019 meeting, the plaintiff offered to provide Brown with **Documentation** confirming his medical conditions (such as a copy of his Psychiatric Evaluation, list of plaintiff's Prescribed Medications, and plaintiff's Doctors Contact Information), but Brown **Refused** to accept said **Documentation**.

84. According to Ms. Couto, *"Supervisors are not allowed to have access to and/or knowledge about your confidential medical information and/or conditions, **Pursuant to Brown University Policy."***

85. Plaintiff thought this was strange at the time of his request, especially

considering the fact that he had already informed both Ms. Couto and Ms. Norcross of the specific complications associated with his medical condition(s) (in Explicit Detail).

86.  Although plaintiff did not know it at the time, his **Supervisor's** (and **HR's**), (**collectively, BROWN**)(S), continued Refusal to take part in the **Interactive Process**, (and **Refusal to Document his Request**), was in *Direct Violation* of **OFCCP Rules** and **Regulations**, as well as being in Direct Violation of numerous Federal and State Laws, including, (but not limited) to:

a.  *The Americans with Disabilities Act of 1990 or ADA   (42 U.S.C. § 12101)*

b.  *Sections 503 and 504 of The Rehabilitation Act of 1973  (29 U.S.C. § 701)*

c.  *The Civil Rights of People with Disabilities Act RI Gen L § 42-87-1*

d.  *FEPA /RI Gen Laws 28-5-7 Unlawful Employment Practices, Section IV*

e.  *The Rhode Island Civil Rights Act ("RICRA") RI Gen Laws 42-112-1 et. seq.*

87.  Also on October 7, 2019, Mr. Pepper is forced to leave work approximately 6 1/2 hours prior to the completion of his scheduled shift, due to chronic exacerbation of aforesaid symptoms (chest pains, tachycardia, confusion, ect.)

88.  At approximately 5:30 p.m., the plaintiff informed (Brown Supervisor) Ms. Katherine Harrop) that he must vacate the premises because; *"My heart rate is really high and it's scaring me."*

89.  Several of the plaintiff's co-workers also expressed concern after observing his deteriorating physical and mental condition.

90.  Later that evening, plaintiff received confirmation from a Coworker (Mr. Hernani Boventura) that Brown had begun an Investigation into the plaintiff's Harassment

Complaint.

91. Mr. Boventura notified plaintiff (via text message) that Ms. Norcross had spoken with Mr. Boventura earlier that evening regarding the continuous harassment of plaintiff perpetrated by Mr. Fernandes.

92. Mr. Boventura was a primary witness named during the plaintiff's October 7, 2019 meeting with Ms. Couto and Ms. Norcross.

93. Mr. Boventura was also a victim of Mr. Fernandes's Unrelenting Harassment.

94. On Thursday, October 10, 2019, Mr. Pepper returned to work and spoke briefly with Ms. Couto, who informed the plaintiff that he, *"Doesn't have to worry about dealing with Tony (Fernandes) today"* because Mr. Fernandes had called out sick that day, after, *"They caught him doing something he wasn't supposed to be doing yesterday."*

95. Also, on Thursday October 10, 2019, Mr. Pepper meets with Ms. Norcross and (Director of Human Resources), Ms. Sheila Coleman ("Ms. Coleman.")  Topics addressed include, (but are not limited to);

    a. The ongoing Discriminatory Harassment of the plaintiff by Mr. Fernandes

    b. Harassment of other Brown employees perpetrated by Mr. Fernandes

    c. The extreme exasperation of plaintiff's symptoms caused by aforesaid Harassment

    d. Plaintiff's medication therapy and the recent corresponding adjustments

    e. Plaintiff's Doctor's recommendation that he immediately be separated from Mr. Fernandes

    f. Plaintiff's concerns regarding elevated risk of Heart attack and/or stroke

(as a result of aforesaid Harassment) and

    g.  The  corresponding importance of prompt, remedial action

96.  During the October 10, 2019 meeting with Brown/HR, plaintiff is assured that;

a.  He and Mr. Fernandes will be kept on opposite sides of the building

b.  *"Brown Supervisors will be closely monitoring the situation."*  *(see Exhibit 3: Affidavit of Sheila Coleman at para. 13)*

c.  Mr. Fernandes will be given a *single warning* to cease his harassing behavior (and that, if Mr. Fernandes failed to heed this warning, *"More drastic action will be taken,"* and also that

d.  *"Brown does not tolerate Unlawful Harassment and/or Discrimination of any of its employees."*

97.  Plaintiff is further instructed to report any additional incidents of Harassment and/or Retaliation to either Ms. Couto, Ms. Norcross, and/or Ms. Coleman and is (once again) assured that any such complaints and/or reports will be addressed promptly and appropriately.

98.  Also on or around October 11, 2019, at Brown's/Ms. Norcorss's request, Mr. Pepper forwarded a revised copy of the 10/6/2019 email complaint to Ms. Norcross. (**Exhibit 2**)

99.  Upon information and belief, on Friday October 11, 2019, Ms. Coleman and Ms. Norcross met with Mr. Fernandes to discuss the alleged harassment.

100.    During said meeting, Mr. Fernandes admitted to engaging in the alleged behavior *"as a joke,"* but denied malicious intent (**see Exhibit 3: Affidavit of Sheila Coleman** at para. 11)**,** see also **Exhibit 4: Brown Position Statement**,

page 3 at para. 3**).**

101.    Upon information and belief, Mr. Fernandes also confirmed plaintiff's allegation that Mr. Fernandes had pointed the symptoms of the plaintiff's medical condition(s) to other Brown employees and encouraged them to join his campaign of Unlawful Harassment.

102.    During the October 11, 2019 meeting, although Mr. Fernandes admitted to subjecting plaintiff to the derogatory Harassment plaintiff had alleged (based upon symptoms of plaintiff's Disability), Mr. Fernandes reported to Brown that he was, *"just trying to have some fun and make some people laugh." (see **Exhibit 3, Affidavit of Sheila Coleman**. at para. 11; see also **Exhibit 4: Brown Position Statement,** page 3 at para. 3; authored by **Ms. Kathleen C. Peterson**)*

103.    During the October 11, 2019 meeting, Mr. Fernandes also asserted the dubious contention that, *"He did not realize his pranks were upsetting Mr.Pepper and that he did not mean to cause Mr. Pepper any harm." (see **Exhibit 3; Affidavit** of **Sheila Coleman** at para 11, see also **Brown Position Statement** page 3 at para. 3).*

104.    Brown (apparently) accepted Mr. Fernandes's contention(s) as true without conducting any further inquiry. Brown fails and/or refuses to interview any additional witnesses and closes its investigation.

105.    Brown does this in spite of the fact that Mr. Pepper had explained that Mr. Fernandes, upon information and belief, had continuously bragged to coworkers that, *"No one makes Nick Angry like I do!!! Hahaha; let's go mess with this guy!!!"*

106.    On October 14, 2019, (exactly one week after his initial verbal complaint),

plaintiff was once again forced to leave work several hours prior to the completion of his scheduled shift due to antagonized and/or exacerbated symptoms of his impairment(s) (Hypervigilance, tachycardia, chest pains, confusion, disorientation, ect.)

107.    Two (2) days later, on October 16, 2019, shortly after awakening, plaintiff experienced increased chest pains and subsequently visited a local Urgent Care Facility.

108.    On October 16, 2019, the Doctor at aforesaid Urgent Care facility performed an EKG test and, upon examination, determined that further analysis must be performed to rule out the possibility of heart attack.  An ambulance was subsequently called to transport the plaintiff to Rhode Island Hospital.

109.    On October 16, 2019, the attending physician at Rhode Island Hospital performed a second EKG and subsequently dismissed the initial doctor's findings.  After waiting several hours in the ER, plaintiff is discharged with the following instructions:

a.  Plaintiff was taken out of work for the following four (4) days due to "frequent panic attacks" (primarily triggered by **Sensory Overload**).

b.  Plaintiff was also advised to notify Brown of recent medical complications that have been exacerbated due to the aforesaid Harassment to ensure prompt resolution.

c.  The Attending Physician also agreed with plaintiff's idea that wearing headphones at work, (as a remedial measure for the Exacerbated Hypervigilance), would likely assist in reducing the sensory overload (and would

also greatly reduce the risk of further antagonizing plaintiff's symptoms).

110. While out on medical leave, Mr. Pepper attempted to initiate the **Interactive Process** for **Requesting** a **Reasonable Accommodation**.

111. On October 17, 2019, Mr. Pepper contacted **Brown University Student and Employee Disability Services**, (*2nd Contact/Attempted* Request) but was deferred to **Brown University's Human Resources Department**.

112. Also on October 17, 2019, Mr. Pepper contacted **Brown Human Resources Department** via the phone number provided by **Disability Services** (*3rd contact/Attempted Request),* but was deferred to a voicemail box, where he provided his contact information and expressed his wish to **Request a Reasonable Accommodation**.

113. The following morning, (October 18, 2019), someone from the **Human Resources Department** attempted to contact Mr. Pepper (at approximately 8 am), but Mr. Pepper, (unfortunately) missed the call. The voicemail, (from the **HR Department**) provided the plaintiff with the phone number of **Brown University's Disability and Accommodation and Leave Manager**, **Ms**. **Stephanie Romano**.

114. On October 18, 2019, plaintiff attempted to contact Ms. Romano (*4th contact/Attempted Request*), but was, once again, deferred to voicemail. Plaintiff provided his contact information and, once again, **Requested a Reasonable Accommodation**.

115. On October 21, 2019, Ms. Romano returned Mr Pepper's call but Mr. Pepper, unfortunately missed her call.

116.    On October 22, 2019, plaintiff returned Ms Romano's call (*5th contact/ Attempted Request*), but was, once again, deferred to voicemail.

117.    Ms. Romano returned the plaintiff's call (approximately 45 minutes later) and informed Mr. Pepper that (to be *considered* for a **Reasonable Accommodation**), he *must* contact **Broadspire**, a third party **Disability Service Provider** that Brown uses to "*assist*" Students and Employees in acquiring **Reasonable Accommodations**.

118.    Also on October 22, 2019, Ms. Romano tells Mr. Pepper that,

a.    after speaking with an Intake "Specialist", (**Step 1**)

b.    Broadspire would assess his need for a Reasonable Accommodation (**Step 2**) and would

c.    Subsequently inform him of any necessary Documentation and/or Medical Information that he needed to supply them with (**Step 3** ).

d.    Once they had received and reviewed the requisite medical records and/or information Mr. Pepper was required to supply, **Broadspire** would *then* send him the (approximately 8 page) **Accommodation Packet** (**Step 4**), **(Exhibit number 5)**

e.    Which had to be filled out with the help of plaintiff's Doctor (**Step 5**), and would undoubtedly, require a separate, special appointment).

f.    When *this* process was complete, Mr. Pepper would then have to forward **Broadspire** the completed Accommodation Packet (**Step 6**),

g.    Which **Broadspire** would then evaluate (**Step 7**),

h.    and would THEN inform Mr. Pepper any further information and/or

Documentation were required (**Step 8),** (which was a definite possibility, they emphasized).

i.  When THAT process was complete, Broadspire would contact Brown (**Step 9**), to inform Brown of **Broadspire's** determination.

j.  Ms. Romano  would subsequently meet with Mr. Pepper and his **Supervisor** to discuss what *"Possible Accommodation"* options would be made available, *"if any,"* **Step 10**).

119.    Plaintiff found this confusing as it seemed to directly contradict the information that he was provided with on October 7, 2019, when he made his first (1st) *Request* for a **Reasonable Accommodation**. Recall from earlier discussion that *"Supervisors are not allowed to have access to and/or know about Employees confidential medical information and/oe conditions, pursuant to Brown University Policy."*

120.    This was a Direct Quote from Brown Dining Services Supervisor **Ms**. **Jean Couto** that was not only emphatically stated on 10/7/2019, but also EMPHATICALLY REPEATED, approximately two weeks later, when Plaintiff again inquired about the possibility of having his **Request** for a **Reasonable Accommodation** "expedited."

121.    Also on October 22, 2019, Ms. Romano subsequently informed the plaintiff that once **steps 1-6** were completed, **Broadspire's** *"Evaluation Process"* was estimated to take somewhere between **4 to 6 weeks**.

122.    Brown did not propose or offer to provide *any* type of **Reasonable Accommodation** during the Interim period of **Broadspire's** 4-6 week

"*Evaluation Process.*"

123.    In accordance with Brown's instructions, Plaintiff contacted **Broadspire** *(7th contact /attempted request; 6th contact/attempted request detailed below)* on November 3, 5, 9, 15, and 19 of 2019 **(Exhibit Number 6).**

124.    Additionally**,** on or around November 9, 2019,  plaintiff faxed a copy of his Psychiatric Evaluation to Broadspire (at Broadspire's request).

125.    On or around November 19, 2019, when Mr. Pepper contacted Broadspire to follow up, however, **Broadspire** politely but apologetically informed the plaintiff that they "*Do not have a file for anyone named Nicholas Pepper,*" (*i.e. they lost his file)*, and that, consequently, Mr. Pepper would have to begin the entire **Intake Process**, (that he had begun approximately *one month prior*), all over again.

126.    When plaintiff relayed this information to his Union Steward, Ms. Tanissa Stone, Ms. Stone was visibly disgusted, and informed the plaintiff, *"They suck; we have had numerous complaints about them already."*  Broadspire had, (at this point), had only been working with Brown for (approximately) two months.

127.    On October 21, 2019, Mr. Pepper returned to work from medical leave.

128.    Two (2) days later, on October 23, 2019, Mr. Fernandes resumed his habit of following the plaintiff around the building in an attempt to Provoke and Antagonize the plaintiff.

129.    Mr. Fernandes's behavior was in direct violation of Brown's purported "*informal accommodation"* keeping Mr. Fernandes and the Plaintiff separated. **(see Exhibit 3: Affidavit of Sheila Coleman,** see also **Exhibit 4: Brown Position Statement.)**

22

130.  On October 24, 2019, (pursuant to Brown's instructions and in line with Brown's purported **Anti-Harassment Policy**), Mr. Pepper once again **emailed** Ms. Norcross to report Mr. Fernandes's absurd behavior and (now) Retaliatory Harassment. (**Exhibit 7**)

131.  This was the plaintiffs second (2nd) complaint regarding Unlawful Harassment and/or Discrimaniton in the month of October 2019.

132.  In the October 24, 2019 email (**Exhibit 7**), Mr. Pepper informed Ms. Norcross that:

a.)  The Harassment had resumed

b.)  Plaintiff feared for his safety, and that

c.)  Upon information and belief, Mr. Fernandes had also continued to Harass other Brown employees, in spite of the verbal warning he had received from Management/HR.

133.  Shortly after plaintiff arrived at work on October 24, 2019, Ms. Norcross acknowledged that she had received the email but claimed she was unable to decipher its meaning due to typographical errors.

134.  Also on October 24, 2019, when plaintiff offered to revise the email on his lunch break, Ms. Norcross assured the plaintiff that this was not necessary and that they would address the issue later that day, stating, "*We will definitely talk about this later."*)

135.  Ms. Norcross, however, DID NOT follow up with Mr. Pepper on October 24, 2019.

136.  In fact, Ms. Norcross never spoke with Mr. Pepper again (with regards to his

10/24/2019 email complaint/report of Unlawful Harassment ), in Direct Violation

of: **RI Gen Law S 28-5-7** *et. seq*. **(Section V),** which explicitly states that:

It shall be an unlawful employment practice:

*(1) For any employer: (v) When an employee has presented to the employer an internal*

*complaint alleging harassment in the workplace on the basis of race or color, religion,*

*sex, disability, age, sexual orientation, gender identity or expression, or country of*

*ancestral origin, to refuse to disclose in a timely manner in writing to that employee the*

*disposition of the complaint, including a description of any action taken in resolution of*

*the complaint; provided, however, no other personnel information shall be disclosed to*

*the complainant.*

137.   The very next day, (October 25, 2019), Mr. Fernandes's **Harassment** and **Provocation** of the plaintiff once again began *escalating*.

138.   On October 25, 2019, Mr. Fernandes was waiting for the Plaintiff (at his assigned workstation, the burger grill) when plaintiff returned from lunch break.

139.   Plaintiff was warned by (Coworker) Mr. Jose Garcia not to return to the grill immediately after his break because; *"Tony is out there waiting for you; he's trying to mess with you."*

140.   Upon information and belief, Mr. Garcia was also a victim of Mr. Fernandes's Unrelenting Harassment.

141.   On October 25, 2019, in accoradnce with Brown's prior instructions, the plaintiff reported directly to Ms. Coleman's office to notify her that:

A.) the Harassment had continued and was *escalating,* and that

B.) Mr. Fernandes had ignored Brown's instructions that *"he keep his distance from Mr. Pepper." (see **Exhibit 3; Affidavit of Sheila Coleman** at para. 13, see also **Exhibit 4; Brown Position Statement,** page 3 at para. 4).*

142.   In response, (and contrary to prior assurances), Ms. Coleman informed the plaintiff that there was nothing that she could do because, *"He (Tony Fernandes) isn't breaking any rules."*

143.   When Mr. Pepper reminded Ms. Coleman of the agreement that Mr. Fernandes was supposed to keep his distance from the plaintiff, Ms Coleman denied making any such assurance and instead stated, *"I wasn't made aware that was the agreement; the agreement was that he stops Harassing you, **not that he stays away from you."***

144.   Ms. Coleman further advised Mr. Pepper that, (in spite of the ongoing Harassment), he had to do his best to get along with Mr. Fernandes because, *"You do work in the same building."*

145.   During the October 25, 2019 impromptu meeting, when Mr. Pepper stated that Mr. Fernandes was attempting to **Provoke** Mr. Pepper in **Retaliation** to his prior **Harassment Complaint, (Protected Activity)**, Ms. Coleman **Unlawfully Refused To Investigate** and flatly stated, *"That's just your opinion."*

146.   Also on October 25, 2019,  when the plaintiff stated that there were witnesses who could confirm his allegations, Ms. Coleman replied, *"Well, that's just their opinion."*

147.   Also on October 25, 2019, when the plaintiff **Requested Assistance** with regards to a **Reasonable Accommodation** *(6th contact/attempted request),* Ms.

Coleman informed the plaintiff that **Reasonable Accommodations** were "*not her Department*" and that he would have to contact **Disability Services**.

148.    When the plaintiff inquired about the possibility of being allowed to wear earbuds (headphones) at work, (as a **Remedial Measure** to counteract the Disorienting and Alarming effects of the **Exasperated Hypervigilance** that he was experiencing as a direct result of the **Unlawful Harassment),** Ms. Coleman expressed extreme skepticism that this **Accommodation** would be approved and further remarked, "*Maybe you can ask your Psychiatrist for another suggestion.*"

149.    When the Plaintiff inquired about the possibility of a transfer to a different dining room, (away from the ***Serial Harasser*** that Brown *refused* to discipline or separate Mr. Pepper from), the plaintiff was told that he would have to check the Brown University Workday Website, as *"They post new positions every Tuesday."*

150.    This website is the same Resource that *all* Brown Employees have access to at *all* times (ie, Ms. Coleman was just informing the plaintiff that he had the same rights and privileges as ALL other Brown University Employees. This is neither a Reasonable Accommodation**,** nor the "*Good Faith Effort*" *required by law* (or by **OFCCP Rules and Regulations).**

151.    In closing, on October 25, 2019, Ms. Coleman told plaintiff that she would "*have another talk with Tony (Fernandes).*"

152.    Ms. Coleman, by her very own admission, failed and/or refused to follow up on even this *Highly Questionable Remedial Measure.* (see **Exhibit 3**, at para. 14; ("*After the October 11, 2019 meeting with Mr. Fernandes, I did not meet with him*

26

*again.* **No additional incidents of harassing behavior by Mr. Fernandes were reported by Mr. Pepper or anyone else within Dining Services either before or after the October 11, 2019 meeting.")**

153. No corrective action was taken in response to either plaintiff's 10/24/2019 email complaint or his 10/25/2019 meeting with Ms. Coleman.

154. Mr. Fernandes was neither formally or informally admonished or reprimanded.

155. Brown made no effort to investigate the plaintiff's complaints and/or reports of Unlawful Retaliatory Harassment made on 10/24/2019 and 10/25/2019.

156. Consequently, the Harassment continued unimpeded and Mr. Fernandes continued to follow the plaintiff around the building in an attempt to Provoke and/or Antagonize him.

157. On October 28, 2019, Mr. Pepper requested another meeting with Ms. Coleman through his Union Steward, Ms. Tanissa Stone. Ms. Coleman initially agreed to meet with the plaintiff but subsequently failed and/or declined to do so.

158. Also on October 28, 2019, pursuant to Brown's prior instructions, the plaintiff also requested to speak with his (Supervisor) Ms. Couto to address the problem, but Ms. Couto declined, saying something to the effect of, *"I'm sorry but I don't have the time right now."*

159. On October 28, 2019 upon arriving home, Mr. Pepper typed up his third (3rd) email/electronic complaint **(Exhibit 8)** and forwarded it to: Ms. Norcross, Ms. Couto, Ms. Stone, and (Union Steward) Ms., Alexx Gonsalves.

160. In the October 28, 2019 **email (3rd electronic complaint, Exhibit 8),** Mr. Pepper (once again) explicitly notified Brown that;

    a. the Harassment had continued and was *escalating* and that

    b. *"I feel like I am being stalked by this sick individual."*

    c. the Harassment had already taken a tremendous toll on physical and psychological health

    d. He would be taking the next four (4) days out of work and that

    e. He feared that the (Unlawful Harassment) situation would turn violent if it were not addressed promptly.

161.    Mr. Pepper closed out the email by stating; *"Also, I have three witnesses who can corroborate my story so hopefully that can help us resolve this situation once and for all."*

162.    Plaintiff returned to work on November 2, 2019.

163.    On November 2, 2019, Mr. Pepper spoke with (Union Steward) Ms. Gonsalves who subsequently informed plaintiff that

a. she had forwarded the email to not only Ms. Coleman, but also to (Director of Dining Services), Mr. George Barboza

b. The matter was being investigated and that *"This isn't the end of this situation,"* and also that

c. Ms. Coleman would soon be in contact with the plaintiff to address the situation.

164.    Also on November 2, 2019, plaintiff was told that (in response to the **10/28/2019 Email Complaint/ Exhibit 8**), Ms. Coleman *"is going to have another talk with Tony (Fernandes)."*

165.    Ms. Gonsalves also notified plaintiff that Ms. Coleman had requested that the plaintiff *not discuss the Harassment with his coworkers,* as this would likely

"*impede the investigation*."

166.   Plaintiff patiently waited to hear back from someone back from Brown's Management Team but after three (3) weeks had passed, it became apparent that Brown had disregarded both his second (2nd) and third (3rd) electronic complaints/reports of Unlawful Harassment (in direct violation of **Rhode Island Labor and Labor Relations: Chapter 28-5-7 Unlawful Employment Practices: Section V.)**

167.   The only response to plaintiff's 10/24/2019 and 10/28/2019 email complaints, **(Exhibits 7 and 8),** came from his Union Stewards, who (as stated previously), were as helpful and supportive as they could possibly be but, (much like Mr. Pepper), were unfortunately lied to and misled by Brown Dining Services "Management Team".

168.   Additionally, while waiting to hear back from Brown's Management Team, plaintiff began receiving billing statements for co-pays for the ER visit and the ambulance transport services he required on 10/16/ 2019 (for his aforementioned medical complications).

169.   Due to Brown's continued Refusal to investigate and/or correct the Hostile Work Environment, the Harassment continued and plaintiff's health continued to worsen rapidly.

170.   On November 18 and November 25, 2019, in his final request for corrective action, Mr. Pepper filed two (2) reports with **Brown's Bias Review Board** (**Exhibits 9A** and **9 B; fourth (4th) electronic complaint).**

171.   Plaintiff was subsequently contacted via email and scheduled a meeting with

Brown's Institutional Equity and Diversity Officer and *"Civil Rights Investigator,"* Mr. Lawrence Angelo, for November 26, 2019.

172.    During said meeting, plaintiff once again relayed the details of Mr. Fernandes's Disturbing, Discriminatory Harassment including,(but not limited to):

a.  the degrading and humiliating Harassment that plaintiff been forced to endure for several months

b.  The repeated and deliberate triggering of plaintiffs symptoms (Hypervigilance) by Mr. Fernandes

c.  The alarming effects that plaintiff's exacerbated symptoms had on his health

d.  the  corresponding financial cost of the Harassment (complete with an itemized list totaling over $1,700 in lost wages, medical bills, and continuing psychotherapy)

e.  the fact that Mr. Fernandes had solicited and/or encouraged other employees to take part in his Unlawful and Unprovoked Harassment of the plaintiff

f.   the disturbing Benadryl poisoning incident of a friend and co-worker

g.   the continued harassment of numerous other Brown employees, as well as

h.  (Director of Human Resources) Ms. Sheila Coleman's continued failure and refusal to exercise corrective action (in spite of her direct knowledge of numerous direct **FEPA** and **EEOC** violations.)

173.    Plaintiff ended the conversation by emphasizing that he did not wish to cause any undue hardship to Brown but that he simply could not work with this individual any longer.

174.    Although Mr. Angelo seemed sympathetic and genuinely alarmed by

Egregious Harassment, no corrective action was taken as a result and Brown made no effort to investigate the plaintiff's additional complaints of Unlawful Harassment and/or Disparate Treatment.

175.   Plaintiff had the next three (3) days out of work due to the Thanksgiving holiday weekend.

176.   Mr. Pepper returned to work on November 30, 2019.

177.   Much to the plaintiff's surprise, however, Mr. Fernandes had not been terminated (or even transferred to a different building).

178.   The following day, (December 1, 2019), (nearly two months after plaintiff's initial complaint), an altercation between the plaintiff and Mr. Fernandes ensued.

179.   During said altercation, Mr. Pepper punched Mr. Fernandes several times.

180.   Once the altercation was broken up, Brown took statements from both individuals.

181.   Upon information and belief, on December 2, 2019, Ms. Coleman initiated an internal "Investigation" with regards to the altercation.

182.   Also on December 2, 2019, Ms. Coleman interviewed and/or took statements from several witnesses.

183.   Curiously, (and in contrast to Brown's stated Policies), however, no investigation was performed with regards to Mr. Pepper's 2, 3, or 4th electronic complaints and/or reports of Unlawful Harassment, Discrimination, and/or Retaliation.

184.   Also, in contrast to Brown's own purported Policies, Brown inexplicably declined and/or refused to interview any additional witnesses after October 7,

2019 (with regards to the allegations of Unlawful Harassment).

185.   Brown did so in spite of the fact that plaintiff explicitly offered to provide three (3) witnesses in his third (3rd) complaint (**Exhibit 8**).

186.   Additionally, Brown declined to interview any additional witnesses *in spite of Brown's direct knowledge that the Harassment often occurred in the presence of other employees.*

187.   On December 3, 2019, plaintiff received a **certified letter (Exhibit 10)** from Ms. Coleman, stating that he was being put on administrative leave effective immediately.

188.   Mr. Pepper was further instructed that he was *"not to contact anyone who might be involved with the investigation,"* (which would necessarily include his Union Stewards). See **Exhibit 10: Administrative Leave Notice/No Contact Order)**

189.   Plaintiff was told, however, (in writing) that he *"would be invited to a meeting to share his insights,"* before the conclusion of the investigation (see **Exhibit 10).**

190.   On December 4, 2019, Mr. Pepper finally receives his **Accommodation** questionnaire from Broadspire (**Exhibit 5**);

a.   One (1) month after Mr. Pepper's initial contact with Broadspire and

b.   nearly two (2) months after his first request for a Reasonable Accommodation to Brown (on October 7, 2019).

191.   Curiously, Brown's own **Administrative Policies/Human Resources** webpage provides the following instructions for Employees who wish to Request

a Reasonable Accommodation;

a. **(1)** Call Broadspire to initiate your request for reasonable accommodation. Someone is available 24/7, 365 days per year.

b. (2) *Within* **two (2) days** *from the day you report your request, a packet will be mailed to you with the accommodation paperwork for you and your medical care provider.*

c. (3) **Broadspire** will partner with **University Human Resources** to assist with your **Reasonable Accommodation Request**.

(reference:https://www.brown.edu/about/administration/human-resources/employee-ac commodation-services).

192.    Considering that plaintiff first contacted Broadspire on November 3, 2019, (yet didn't receive his Accommodation paperwork until December 4, 2019), it would seem that Brown has, (yet again), failed and/or declined to adhere to another one of its own Policies.

193.    **All** of Broadspire's outgoing correspondences and follow ups with Mr. Pepper (Broadspire's purported "*reminders and extensions*") came **after** the December 1, 2019 altercation. (see **Exhibit 4; Brown Position Statement,** page 11 at para. 4).

194.    On or around December 14, 2019, Mr. Pepper received a certified letter from Ms. Coleman **(Exhibit 11: Termination Letter),** stating that Ms. Coleman had "*concluded her investigation*" and that Mr. Pepper was "*terminated effective immediately*."

195. Contrary to Ms. Coleman's/Brown's prior assurance, Mr. Pepper was *not* given an opportunity to provide his insights on the situation prior to his termination.

196. Mr. Pepper subsequently filed a Grievance with the Union in response to the Unlawful Harassment and Disparate Treatment *that he was forced to endure as a condition of continued employment. (Exhibit 12; Union Grievance, page 2).*

197. Due to the Winter Break, however, **Brown** delayed the scheduling of the Grievance Hearing until January 29, 2020.

198. Present for the (first) Level Three (3) Grievance Hearing on 1/29/2020 were: Mr. Pepper, Ms. Coleman, (Brown Director of Residential Dining Services) Ms. Claire Sidla, Union Steward Ms. Tanissa Stone and Union Representative Ms. Karen Mcaninch.

199. During the initial 1/29/2020 **Stage 3 Grievance Hearing,** Ms. Coleman once again denied making any guarantees or assurances during the October 10, 2019 meeting, *including the agreement to separate Mr. Pepper from Mr. Fernandes.*

200. Ms. Coleman later contradicted herself by stating that the Brown had done its best to keep Mr. Pepper and Mr. Fernandes on opposite sides of the building, and that that was as much as could be reasonably expected.

201. Inexplicably, Ms. Coleman also vehemently denied making any promises and/or assuarances to take *Prompt and Appropriate Corrective Action*, instead making the bizarre and puzzling statement that, *"There was never any agreement that the Harassment would stop immediately; only that it would*

*stop."*

202.    After hearing Ms. Coleman's confusing and paradoxical explanations attempting to justify her Refusal to Exercise Corrective Action, plaintiff's Union Representative, Ms. McAninch, informed Ms. Coleman that, in Ms. McAninch's Professional Opinion, *"You didn't do anything to prevent this situation from escalating, Sheila. Nicholas made numerous complaints and expressed fear for his safety. I don't think a transfer to a different dining room would have been unreasonable."* (Sidenote, Brown University has (5) five separate dining rooms/cafeterias located in different buildings within a few blocks of campus).

203.    Ms. Coleman frustratingly responded by making yet another puzzling statement; *"Well, I'm not a doctor but I have a hard time believing that being in the same building as someone else can give you life-threatening medical problems. Besides, I've never seen a doctor's note saying that Tony (Fernandes) is bad for Nicholas's health."*

204.    Recall from earlier discussion that when Mr. Pepper offered to supply Brown with a copy of his **Psychiatric Evaluation**, a list of his prescribed medications, and his Doctors contact information (during his initial verbal complaint(s) on 10/7/2019 and 10/10/2019), **Brown Supervisors** and **HR Representatives** were quick to inform Mr. Pepper that this was not necessary, as

a.    *"The University respects your right to privacy,"* and

b.    *"You don't have to discuss or disclose any further information about your medical conditions."* (A Direct Quote from **Supervisor Ms**. **Jean Couto**.)

205.    At the time, the plaintiff thought that Brown was being genuinely respectful

but now it seems much more likely that they were trying to protect themselves from liability in the event that the **Harassment** did indeed escalate, (what we may VERY loosely refer to as "plausible deniability.")

206.    When Ms. McAninch asked Ms. Coleman if there was a Doctor or Medical Professional with whom she could have consulted with before ignoring plaintiff's complaints and dismissing the Urgent concerns he had repeatedly expressed for his health, Ms. Coleman simply replied, "*No.*"

207.    Also, when Ms. McAninch inquired what happened to plaintiff's **Accommodation Request** Information, (during the **1/29/2020 Grievance Hearing),** Ms. Coleman replied that, *"It was wiped out when NIcholas was terminated."*

208.    Ms. McAninch found this highly suspicious and said as much to Ms. Coleman.

209.    Also, of critical significance, during aforesaid Hearing, when Ms. McAninch asked Ms. Coleman if she had been contacted by the **OIED Office** subsequent to Mr. Pepper's **November 26, 2019** Meeting **(**with Mr. Lawerence Angelo), Ms. Coleman claimed that she had ***not*** been contacted by the **OIED Office**.

210.    This is yet another statement that Ms. Coleman later contradicted in her Affidavit (see **Exhibit 3** at para. 25-27);

*(25. On November 26, 2019, Derek DeBobes, former Assistant Vice President in OIED, reported to me that Mr. Pepper had **called** to **talk** to OIED about the **process** of filing a discrimination complaint against Mr. Fernandes. Mr. DeBobes inquired about separating Mr. Pepper and Mr. Fernandes, placing one of them in a different location,*

*26. I informed Mr. DeBobes of Mr. Pepper and Mr. Fernandes' shift schedules and* **pointed out that the two of them would only overlap on Sunday, December 1, 2019 as Brown University observed Thanksgiving recess from November 27, 2019 through November 30, 2019, and they both worked Sunday dinner.** *Supervisors were specifically directed to have the two separated in the Main Dining Room working opposite sides of the floor.*

*27. Based on this discussion with Mr. DeBobes, myself and managers in the Dining Services department prepared to discuss permanent measures to keep Mr. Pepper and Mr. Fernandes separate at work.*

*28. On December 1, 2019, Mr. Pepper viciously assaulted Mr. Fernandes. In accordance with the University's Workplace Violence policy, police and security were notified, and Mr. Pepper was immediately placed on administrative leave pending the outcome of an internal investigation. (See Exhibit 3 to Brown's Position Statement.)* ***I immediately initiated an internal investigation")* .**

211.    Lastly, on January 29, 2019, in closing, when Ms. McAninch asked Ms. Coleman if *any* disciplinary action had been taken against Mr. Fernandes (with regards to the continuous Unlawful Harassment), Ms. Coleman replied that, while *no actual disciplinary action was ever* taken, she

A.    ***"Had several talks with Tony (Fernandes)," and***

B.    *"Made it very clear his behavior was unacceptable"*.

212.    Thus, Ms. Coleman made yet another false statement which she later

contradicted in her **Affidavit. (**See **Exhibit 3,** at para. 14: *"After the October 11, 2019 meeting with Mr. Fernandes, I did not meet with him again. No additional incidents of harassing behavior by Mr. Fernandes were reported by Mr. Pepper or anyone else within Dining Services either before or after the October 11, 2019 meeting."*)

213.    Ms. McAninch repeated her earlier statement to Ms. Coleman that, in Ms. McAninch's Professional Opinion, Ms. Coleman had not done anything to prevent the situation from escalating, in spite of all of the documented complaints and clear indications that the situation would eventually and inevitably erupt.

214.    Ms. Coleman angrily replied that she *"disagreed with Ms. McAninch's opinion"* and that she did her best to resolve the situation.

215.    When plaintiff asked Ms. Coleman why she refused to meet with him after he had made numerous additional complaints (and after she had assured two (2) separate Union Stewards  (on two (2) separate occasions) that she would do just that, Ms Coleman stuttered nervously before saying that she thought the issue had been addressed and that, *"It was my belief that the Harassment had stopped."*

216.    When Mr. Pepper asked Ms Coleman what part of the **5 page** extensive email complaint he had sent on **10/28/2019 (Exhibit 8) (**which listed numerous elements of the *Escalating* **Retaliatory Harassment**), indicated that the **Harassment** had stopped, Ms Coleman was at a loss for words (unsurprisingly).

217.    Approximately, one week later, **February 6, 2020,** Mr. Pepper attended his **second (2nd) Level Three Grievance Hearing**.

218.    Although, it is not Standard Operating Procedure to schedule back-to-back **Level 3 Grievance Hearings** to address the EXACT same issues, (in most cases, one (1) Hearing will suffice), the Rescheduled  (2nd) Hearing was necessary because Ms. Coleman declined to inform (Director of Labor and Labor Relations), Ms. Rhonda  Hospedales of the initial **Hearing.**

219.    In fact, subsequent to the commencement of the January 29, 2020 Hearing, Ms. Coleman, despite being the **Director of Human Resources** (at the time), *appeared to be unaware of the fact the (**Director** of **Labor and Labor Relations**) **Ms**. **Hospedales's** presence was **Mandatory** for **Level Three Grievance Hearings**.*

220.    Ms. Coleman subsequently informed Ms. Mcaninch that she *"didn't know Rhonda (Hospedales) was supposed to be here,"* and that, *"I'll have to email her to set up another meeting."*

221.    Present for the second (2nd) **(2/6/2020) Level 3 Hearing** were Mr. Pepper, Ms. McAninch, Ms. Tanissa Stone, Ms. Claire Sidla, Ms. Coleman, and Ms. Hospedales.

222.    Ms. Hospedales initially seemed concerned and expressed interest in *Investigating* (and potentially) remedying the Unlawful Harassment.

223.    Ms. Hospadeles also notified the plaintiff that *she* would be Requesting an Extension with regards to the deadline for her decision, as the complexity of the situation would require a more detailed analysis than the standard three (3) day deadline would allow.

224.    Mr. Pepper subsequently forwarded Ms. Hospedales (approximately) five (5)

additional email complaints, along with a revised version of his original **Union Grievance**.

225.    Also of critical significance, Mr. Pepper forwarded Ms. Hospedales a screenshot of his outgoing calls to Broadspire.

226.    Ms. Hospedales  concluded her "*Investigation*" and (finally) rendered a decision on June 8, 2020, four (4) months after the 2/6/2019 Level 3 Grievance Hearing (which typically has a **Maximum Timeline Provision** of fifteen (15) working days).  According to Ms. Hospedales;

*"The circumstances of this case are most unfortunate. While Pepper's description of behavior that he was allegedly subjected to by Fernandes is concerning, and even in some cases, substantiated by Dining Services, there is nothing in the record that shows that Dining was not immediately receptive and/or responsive to his workplace concerns. Dining Services management was in frequent touch with Pepper and advised him as best as they could under the circumstances, as well as providing him with the necessary resources/contacts to be able to assist him through this situation. This even included **counseling Fernandes** about his behavior and following guidance from OIED in **considering** workplace measures that would limit the contact between Pepper and Fernandes. In the end, Pepper is the one who is **solely accountable** for his conduct on December 1, 2019 wherein he assaulted Tony Fernandes, who by numerous witness accounts, **did not engage in behavior on that same day that would have provoked Pepper into assaulting him.** Even assuming Pepper was provoked by the same behavior he complained of against Fernandes either*

*before or on December 1st, his conduct in assaulting Fernandes was inappropriate and would still be found in **violation** of the University's Workplace Violence policy. By most witness descriptions, the assault of Fernandes was particularly violent and could have resulted in significant injuries if work colleagues had not immediately intervened. Thus, termination of Pepper was appropriate based on the seriousness of the workplace conduct." (**Rhonda Hospadales, Exhibit 12,** page 6).*

227.    **Ms. Hospedales also falsely asserted that, "the Hearing Officer actually postponed the Hearing for several weeks in order for Mr. Pepper with time to provide documentation to support his claim that Broadspire's failed to process his accommodation despite his compliance," ( Exhibit 12).**

228.    First and foremost, the Grievance Hearing was initially postponed due to 1/29/2020 (due to **Brown's** winter break), then had to be rescheduled again for 2/6/2020 because Ms. Coleman failed and/or declined to inform Ms. Hospedales of the initial 1/29/2020 Hearing.

229.    Furthermore, Mr. Pepper forwarded  Ms. Hospedales the last of the requisite information on February 11, 2020 (approximately five (5) days after the second Level Three (3) Grievance Hearing.

230.    On or around February 20, 2020, plaintiff was notified (via text message) by (Union Steward) Ms. Stone that Ms. Hospedales had reviewed the documents and wanted to set up another meeting.  Brown/Ms. Hospedales, however, failed and/or declined to follow up and the proposed meeting was

41

never scheduled or arranged.

231.   Mr. Pepper was NOT informed of Ms. Hospedales/Brown's decision and was not afforded an opportunity to contest the decision and/or even inquire about how Ms. Hospedales arrived at her alleged conclusion.

232.   In fact, Mr Pepper did not learn of Brown's Decision until he received Brown's Position Statement from RICHR on December 18, 2020.

233.   Curiously, it took Ms. Hospedales four (4) months to render a decision (and she apparently did so without interviewing any of the witnesses named in plaintiff's report who could support and/or verify plaintiff's allegations.)

234.   Also of suspicious timing, Ms. Hospedales rendered her decision on June 8, 2020, exactly one week prior to plaintiff's Unemployment Hearing (on June 15, 2020).

235.   It is Interesting to note that Brown initially contested plaintiff's Unemployment but subsequently declined to attend the Hearing (without even giving notice to the Hearing Officer and/or DHS).

236.   Ms. Hospedales also published and/or submitted statements to the RICHR that she knew and/or should have known were false and/or deliberately misleading. (see **Exhibit 12: Union Grievance**);

(**"The record is also clear that Pepper did in fact attempt to apply for an accommodation through Broadspire, as early as November 19, 2019.** Despite his testimony that he complied with all requests for the necessary documentation and that he never heard anything back from Broadspire, Stephanie Romano, Leave and

*Accommodation Manager confirmed that despite several conversations between Pepper, her and/or Broadspire regarding the application due and extensions, UHR had never received the accommodation questionnaire back from him and his claim was closed on February 1, 2020". ( Exhibit 12: Union Grievance)*

237.    This statement is particularly puzzling (not to mention Deliberately Misleading and Blatantly Perjurious) given the fact that plaintiff had not only informed Ms. Hospedales of his contacts with Broadspire that occurred prior to 11/19/2019, (and that 11/19/2019 was the date that Broadspire had informed Mr. Pepper that they had *lost* his file), but also because plaintiff had forwarded Ms. Hospedales a screenshot of his outgoing call logs/correspondences with **Broadspire** on or around February 8, 2020.

238.    Last, but certainly not least, Brown conducted a **Sham Investigation** and **Manufactured Retrospective Documentation**, which Brown then presented to the RICHR during the course of RICHR's investigation.

239.    Brown (by way of two (2) of its Representatives, Ms. Coleman and (Brown Deputy Counsel) Ms. Kathleen C. Peterson), made numerous references to a alleged October 31, 2019 meeting that Brown supposedly had with plaintiff in response to plaintiff's  10/24/2019 **(Exhibit 7)** and 10/28/2019 **(Exhibit 8)** email complaints. (See **Affidavit of Sheila Coleman** at para. **18-22)**

(18. "On **October 31**, **2019**, *I met with Mr. Pepper in response to an October 24, 2019 email that he had sent to one of his co-workers and dining supervisors regarding the situation with Mr. Fernandes. In the* **October 24**, **2019 email**, *Mr.*

43

*Pepper described in great detail his medical conditions and how his interactions with Mr. Fernandes exacerbated his health issues. (See Exhibit 2 to Brown's Position Statement.)*

19. **"During the October 31, 2019 meeting, Mr. Pepper described what he was going through by just thinking about Mr. Fernandes, and how the situation has affected every aspect of his life. Mr. Pepper went into great detail of his health conditions, how his body is reacting to Mr. Fernandes' behavior, and his conversations with family members, his regular doctor, Urgent Care doctors and various employees he has spoken to.** *I again encouraged Mr. Pepper to seek a medical accommodation, and provided him with the contact information and resources to do so."*

20. **"During the October 31, 2019 meeting, I asked Mr. Pepper if there were any new incidents involving Mr. Fernandes to report, and he did not have any to discuss. Mr. Pepper stated that he was feeling as though Mr. Fernandes was being sneaky, but could not provide any specific incidents of harassing behavior. After October 31, 2019, Mr. Pepper did not request to meet with me."**

21. **"Contrary to Mr. Pepper's Charge allegations, after our October 10, 2019 meeting, Mr. Pepper did not report any new incidents of harassing behavior by Mr. Fernandes,** *nor did supervisors report any additional issues between them.* **Mr. Pepper's email communications and requested meetings after October 10, 2019 were all in reference to Mr. Fernandes' behavior that occurred prior to October 10, 2019."**

44

22. "During each subsequent meeting with me after October 10, 2019, Mr. Pepper rehashed prior incidents with Mr. Fernandes. When I asked Mr. Pepper if he had any new incidents involving Mr. Fernandes to report, he did not have any. Mr. Pepper would allude to that he just couldn't stand to look at or be around Mr. Fernandes.")

240.    An excerpt from **Brown's Position Statement** (**Exhibit 4**) submitted to the RICHR by Brown (authored by Ms. Peterson); "*On October 31, 2019, Ms. Coleman and Ms. Norcross met with Mr. Pepper in response to an October 24, 2019 email that he had sent to four people, including one of his co-workers, dining supervisors, and Ms. Norcross.*

241.    *The **October 24, 2019** email provided a detailed summary of Mr. Pepper's medical conditions and how his interactions with Mr. Fernandes exacerbated his health issues. (See Exhibit 2.) Mr. Pepper explained that he has a physical reaction just by thinking about Mr. Fernandes, and how the situation has affected every aspect of his life. Mr. Pepper went into great detail of his health conditions, how his body is reacting to Mr. Fernandes' behavior, and his conversations with family members, his regular doctor, Urgent Care doctors and various employees he has spoken to. Ms. Coleman again encouraged Mr. Pepper to seek a medical accommodation, and provided him with the contact information and resources to do so.*

242.    **During the October 31, 2019, Ms. Coleman asked Mr. Pepper if there were any new incidents involving Mr. Fernandes to report, and Mr. Pepper did not have any to discuss. Mr. Pepper stated that he was feeling as though Mr. Fernandes was being sneaky, but could not provide any specific incidents of harassing behavior. After**

*October 31, 2019, Mr. Pepper did not request to meet with Ms. Coleman. (See Exhibit 3 at para. 18-20.)*

243.   Curiously, Mr. Pepper was absent from work from 10/29/2019 until 11/2/2019. Thus, Brown's *only purported Response* to the plaintiffs second and third email complaints (**Exhibits 7** and **8) of Unlawful Harassment** was a meeting which allegedly occurred when the plaintiff was not even in the building.

244.   Furthermore, the 10/31/2019 meeting allegedly took place in the middle of a four (4) day span in which plaintiff was absent from work.

245.   Both Ms. Coleman and Ms. Peterson provided detailed descriptions (to the RICHR) of the alleged 10/31/2019 meeting (detailed above), including a summarization of comments purportedly made by Mr. Pepper during said meeting (*even though Mr. Pepper was neither present for the alleged "meeting" or even in the building on 10/31/2019).*

246.   Furthermore, Brown/Ms.Coleman/Ms. Peterson cited plaintiff's *alleged failure* to provide more specific details during said meeting as justification for Brown's continuous refusal to investigate (**see Exhibits 3 and 4)** *"During the October 31, 2019, Ms. Coleman asked Mr. Pepper if there were any new incidents involving Mr. Fernandes to report, and Mr. Pepper did not have any to discuss. Mr. Pepper stated that he was feeling as though Mr. Fernandes was being sneaky, but could not provide any specific incidents of harassing behavior. After October 31, 2019, Mr. Pepper did not request to meet with Ms. Coleman. (See Exhibit 3 at para. 18-20.)*

247.   While it is technically accurate to say that Mr. Pepper did not describe any "*new incidents*" of harassing behavior during the October 31, 2019 meeting, this

is simply because the **October 31, 2019** meeting ***did not happen!!!!***

248.    Mr. Pepper's Facebook Messenger correspondence with Union Steward Ms. Alexx Gonsalves (**Exhibit 13: October 31, 2019 Facebook Message Correspondence)** confirms his absence from work on the day of the *alleged* meeting.

249.    Curiously, Mr. Pepper also spoke with (Supervisor) Ms. Couto on October 31, 2019, who contacted him via telephone (**Exhibit 14: call log Jean Couto)** to inquire whether or not he would be coming to work that day.

250.    During said phone call, Ms. Couto adamantly denied receiving the plaintiff's email complaint (**Exhibit 8**) that he had forwarded to Ms. Couto's University email account earlier that day.

251.    Also noteworthy is the fact that Ms. Norcross (who was also *allegedly* present for Brown's Imaginary 10/31/2019 meeting), DID NOT submit an Affidavit to the RICHR confirming her presence at said meeting.

252.    Recall from earlier conversation that Ms. Norcross was one of the Representatives from Brown's "Management Team" that Mr. Pepper had relayed the information of his ADHD diagnosis to

253.    Furthermore, the plaintiff requested Ms. Norcross relay said information to Brown Supervisors and/or Management Team(in or around May of 2019) to facilitate better communication.

254.    Approximately one week subsequent to plaintiff's final probationary review (in or around May of 2019), Ms. Norcross confirmed that she had relayed said information to Brown Supervisors and/or Management Team.

255.    Thus, (Brown Deputy Counsel) Ms. Kathleen C. Peterson made yet *another false claim in Brown's Position Statement (**Exhibit 4**):*

"*In October 2019, Mr. Pepper notified Dining Services management of alleged harassing behavior being committed against him by Mr. Fernandes, and how this was exacerbating Mr. Pepper's medical condition.* **Prior to October 2019, Brown had no knowledge of Mr. Pepper's disability or medical condition.** *Mr. Pepper's concerns were conveyed in October of 2019 both via email and in person with multiple Dining Services managers. (See Exhibit 2, which includes emails from Mr. Pepper.)*

256.    Also Brown's contention that Mr. Pepper failed to describe or provide any "*new incidents*" of Harassing behavior after October 10, 2019 and that ALL of Mr. Pepper's complaints and/or reports of Harassment pertained to pre 10/10/2019 incidents is also **100 % false**.

257.    Recall from earlier conversation, that when (on October 25, 2019) Mr. Pepper notified Brown that Mr. Fernandes had ignored Brown's warning and/or request that "*he keep his distance from Mr. Pepper*", Ms. Coleman informed the plaintiff that there was nothing that she could do because "*He (Mr. Fernandes) isn't breaking any rules. The agreement was that he stops harassing you, **not that he stays away from you.**"*

258.    Furthermore, on at least two (2) separate occasions, Mr. Pepper had to remind Dining Service Supervisors (Mr. Adam Palazio and Ms. Katherine Harrop) that he was supposed to be separated and (at least) kept on the opposite side of the building as Mr. Fernandes, and that he could NOT be placed on the same workstation as Mr. Fernandes (for obvious reasons).

259.   It should be noted, however, that it is neither Mr. Palazio's nor Ms. Harrops fault that this happened as both supervisors were surprised to hear of this arrangement (of keeping the two employees separated).  Apparently, Brown did NOT inform **all** of its supervisors of this so-called "Informal Accommodation". This casts serious doubt on Brown's dubious contention that, "*Supervisors were closely monitoring the situation.*" Not that closely, apparently.

260.   Lastly, Ms. Peterson's claim that "*Mr. Pepper has offered only his subjective feelings, which fail as a matter of law,*" is also 100% false, as Mr. Pepper offered to provide witness testimony confirming his allegations in his third (3rd) complaint (**Exhibit 8**).  Brown, however, failed and/or declined to follow up with ANY of said witnesses after 10/7/2019.

261.   Brown also Unlawfully failed and/or declined to disclose (to the RICHR) the statement from the single witness they did interview with regards to the Harassment (Mr. Hernani Boventura) on October 7, 2019.

262.   Brown's Deliberate Indifference to the Discriminatory Harassment of one of its employees (by another Brown employee) was an unacceptable failure and refusal to comply with Federal and State Anti Discrimination Laws.  Brown's blatant disregard for

    a.  numerous Federal and State statutes,

    b.  their own alleged policies, and

    c.  their contractual obligation to the United States Government/OFCCP

is a grim but unsurprising reminder that Brown University simply does not care about the law, nor it's ethical, professional, or legal responsibilities.

262. Mr. Pepper was a valued and reliable employee who, as a temporary worker, worked extremely hard to obtain permanent full time employment with Brown. When Mr. Pepper was hired as a permanent employee in September of 2018, he worked even harder to establish a career for himself and to become a valued asset to the company. In addition to performing his job (to *at least*) satisfactory expectations, Mr. Pepper regularly worked several hours past his scheduled shift, averaging 2-3 twelve hour shifts per week, whenever Brown was short staffed (as they often were due to labor code violations and student lawsuits, among other reasons).

263.. For the (approximately) twenty eight (28) months of his employment with Brown, Mr. Pepper did everything that was asked of him and more; from the first day of his employment to his last, Mr. Pepper continued to work hard, hoping to build a new career and make a better life for himself. He did not ask for special or preferential treatment and he did not even *consider* requesting a Reasonable Accommodation until the symptoms of his impairment were severely exacerbated due to the aforesaid Discriminatory Harassment. Even after being subjected to months of Unprovoked, Egregious Harassment, Mr. Pepper simlply asked (and then eventually *begged*) Brown to provide him with a work environment free from Unlawful Harassment and Discrimination. This, however, was simply too much to ask from Brown, so Brown ignored his complaints and/or reports of Unlawful harassment, and ultimately, Brown ignored Mr. Pepper's **Human Rights**, simply because they didn't think it was worth the time and/or effort to comply with the law; Brown simply could not be bothered.

264. Brown treated Mr. Pepper's Human Rights (and the corresponding state and Federal laws) like suggestions, and when Brown deemed those suggestions as being

too inconvenient, Brown simply ignored the law and subjected Mr. Pepper to several additional months of Retaliatory Harassment.

265.  By subjecting Mr Pepper to several months of Egregious and Despicable Harassment, by denying Mr. Pepper a Reasonable Accommodation and Continuously Refusing to Engage on the Interactive Process, by ignoring Mr. Pepper's additional complaints of Retaliatory Harassment and continuously Refusing to Exercise Corrective Action (in direct violation of numerous Federal and State Antidiscrimination Laws), Brown punished Mr. Pepper for having a Disability and as a proximate and foreseeable consequence, Mr. Pepper has been irreparably harmed.

266.  As a direct and proximate result of defendants actions, Mr. Pepper experienced depression, anxiety, mental anguish, extreme sleep disturbances, loss of enjoyment of life, Injury to professional standing, Injury to credit standing, Injury to character and reputation, loss of health, fright, shock, humiliation, indignity, apprehension, loss of self-esteem, strained family relationships, isolation, and grief.

**Count 1: Title 1 of the ADA-Disability Discrimination: Failure to Provide a Reasonable Accommodation**

267.   Plaintiff incorporates by reference paragraphs 1 through 266 as though fully set forth herein.

268.  The actions of the defendant, through its agents, servants, and  employees, in discriminating against plaintiff Mr. Pepper on the basis of his actual and/or perceived disability and/or record of impairment, in failing to provide a reasonable accommodation and/or refusing to make reasonable modifications for his disability violate Title 1 of the American's with Disabilities Act of 1990.

269.  Brown's actions and practices- including (but not limited to) FaReasonable consititue Unlawful Discrimination under the ADA in that Brown has dscriminated against Mr. Pepper on the basis of his disability with regard to the full and equal enjoyment of goods, services, facilities, privileges, advantages, and accommodations.

270.  As a result of Brown's violations of the ADA, plaintiffsufc bodetailed above.

## Count 2: Disability Discrimination Hostile Work Environment in violation of the Title 1 of the ADA

271.  Plaintiff Incorporates by reference the facts alleged in paragraphs 1-270 as though fully set forth herein.

272.  Defendant Brown subjected plaintiff Mr. Pepper to a Hostile Work Environment based on his actual and/or perceived disability as detailed above.

273.  The Hostile Work Environment was severe and pervasive based on the nature of the harassment, including egregious mockery and ridicule of the plaintiff based upon symptoms of his Disability and constant, unwavering harassment and derogatory comments toward plaintiff based upon symptoms of plaintiff's disability.

274.  Plaintiff considered the aforementioned conduct to be discriminatory and reported said discriminatory conduct, both verbally and in writing, to numerous management-level employees of the defendant, including but not limited to HR Director Ms. Sheila Coleman and "Civil Rights Investigator" Mr. Lawrence Angelo.

275.  Accordingly, the defendant was fully aware of a Hostile Work Environment. However, despite plaintiff's numerous complaints of discrimination, defendant failed to adequtely investigate or otherwise cause the discriminatory conduct to cease.

276.  As a result, the plaintiff has suffered and continues to suffer damages.

**Count 3: Disability Discrimination: Retaliation in violation of the ADA**

277.  Plaintiff Incorporates by reference the facts alleged in paragraphs 1-276 as though fully set forth herein.

278.  Defendant Brown did violate the ADA by discriminating against plaintiff because he opposed a practice forbidden by the ADA (Disability Harassment).

279.  Subsequent to engaging in Protected Activity and making complaints of Unlawful Harassment, plaintiff was subjected to additional Retaliatory Harassment.

280.  Defendant made no effort to investigate and/or failed to exercise corrective action in response to Plaintiff's further complaints and/or reports of Retaliatory Harassment in violation of Title I of the ADA.

281. As a result, plaintiff  Mr. Pepper has suffered and continues to suffer damages.

**Count 4: Failure to Provide Reasonable Accommodation in violation of section(s) 503 and 504 of The Rehabilitation Act of 1973.**

282.  Plaintiff Incorporates by reference the facts alleged in paragraphs 1-281 as though fully set forth herein.

283.   As described above, Brown's actions and practices violate Sections 503 and 504 of the Rehabilitation Act of 1973 by failing to provide the plaintiff with a Reasonable Accommodation and continuously Refusing to Engage in the Interactive Process.

284.  Brown is a covered entity for purposes of Sections 503 of the Rehabilitation Act because it has contracts in excess of $10,000 with the OFCCP.

285.  Brown is a covered entity for purposes of Section 504 of the Rehabilitation Act because it operates programs, services, and/or activities receiving Federal funds.

286.  As described above, Brown violated Sections 503 and 504 of the Rehabilitation

act by failing to provide reasonable accommodation and/or make reasonable modifications that would enable Mr. Pepper to have meaningful access to Brown's services, programs, or activities.

287. As a result of Brown's violations, Mr. Pepper has suffered and continues to suffer damages.

**Count 5: Disability Discrimination: Hostile Work Environment in violation Sections 503 and 504 of The Rehabilitation Act of 1973**

288. Plaintiff Incorporates by reference the facts alleged in paragraphs 1-287. As though fully set forth herein.

288. The Hostile Work Environment was severe and pervasive based on the nature of the harassment, including egregious mockery and ridicule of the plaintiff based upon symptoms of his Disability and constant and unwavering harassment and derogatory comments toward plaintiff based upon symptoms of plaintiff's disability.

290. Plaintiff considered the aforementioned conduct to be discriminatory and reported said discriminatory conduct, both verbally and in writing, to numerous management-level employees of the defendant, including but not limited to HR Director Ms. Sheila Coleman and "Civil Rights Investigator" Mr. Lawrence Angelo.

291. Accordingly, the defendant was fully aware of the Hostile Work Environment. However, despite the plaintiff's numerous complaints of Harassment and Discrimination, defendant failed to adequtely investigate or otherwise cause the discriminatory conduct to cease.

292. As described above, defendant Brown has violated Sections 503 and 504 of the Rehabilitation Act.

293.  As a result, the plaintiff has suffered and continues to suffer damages as described above.

**Count 6: Disability Discrimination: Retaliation in violation of sections 503 and 504 of The Rehabilitation Act of 1973**

294.  Plaintiff Incorporates by reference the facts alleged in paragraphs 1-293 as though fully set forth herein.

295.  As described above, Defendant Brown did violate Sections 503 and 504 of the Rehabilitation Act by discriminating against plaintiff because he opposed a practice forbidden by the Rehabilitation Act (Disability Harassment.)

296.  After making complaints and/or reports of Unlawful Harassment and Discrimination, plaintiff was subjected to additional Retalitory Harassment.

297.  Defendant made no effort to investigate and/or failed to exercise corrective action in response to Plaintiff's further complaints and/or reports of Retaliatory Harassment in violation of Sections 503 and 504 of The Rehabilitation Act of 1973.

298.  As a result, plaintiff has suffered and continues to suffer damages.

**Count 7: Disability Discrimination: Failure to Provide Reasonable Accommodation in violation of the Rhode Island Civil Rights Act.**

299.  Plaintiff Incorporates by reference the facts alleged in paragraphs 1-298.

300. As described above, Defendant Brown did violate RI Gen Law 28-5-7 (Section IV)by failing to provide the plaintiff with a Reasonable Accommodation and continuously Refusing to Engage in the iInteractive Process.

301.  As a result, plaintiff has suffered and a1continues to suffer damages as described above.

**Count 8: Disability Discrimination: Hostile Work Environment in violation of the Rhode Island Civil Rights Act.**

302.  Plaintiff Incorporates by reference the facts alleged in paragraphs 1-301 as though fully set forth herein..

303.  Defendant Brown did violate the Rhode island Civil Rights Act by subjecting plaintiff to a Hostile Work Environment based upon his disability.

304.  The Hostile Work Environment was severe and pervasive based on the nature of the harassment, including egregious mockery and ridicule of the plaintiff based upon symptoms of his Disability and  constant and unwavering harassment and derogatory comments toward plaintiff based symptoms of his disability.

305.  Plaintiff considered the aforementioned conduct to be discriminatory and reported said discriminatory conduct, both verbally and in writing, to numerous management-level employees of the defendant, including (but not limited to) HR Director Ms. Sheila Coleman and "Civil Rights Investigator" Mr. Lawrence Angelo.

306.  Accordingly, the defendant was fully aware of a Hostile Work Environment. However, despite plaintiff's numerous complaints of Unlawufl Hrassment and Discrimination, defendant failed to adequtely investigate or otherwise cause the discriminatory conduct to cease.

307.  As a result, the plaintiff has suffered and continues to suffer damages as described above.

**Count 9: Disability Discrimination: Retaliation in violation of the Rhode Island Civil Rights Act**

308.  Plaintiff Incorporates by reference the facts alleged in paragraphs 1-307.

309.  Defendant Brown did violate the Rhode Island Civil Rights Act by discriminating against plaintiff because he  opposed a practice forbidden by the RICRA (Harassment).

310.  After plaintiff made complaints and/or reports of Unlawful Harassment, plaintiff was subjected to additional Retaliatory Harassment.

311.  Defendant Brown made no effort to investigate plaintiff's complaints and/or reports of Retaliatory Harassment..

312.  As a result of defendants Unlawful conduct, plaintiff has been harmed and damaged as described above.

**Count 10:  Disability Discrimination Failure to Provide Reasonable Accommodation in violation of the Rhode Island Civil Rights of People with Disabilities Act ("RICRPDA")**

313.  Plaintiff incorporates by reference the facts alleged in paragraphs 1-312 as though fully set forth herein.

314.  Defendant Brown did violate the RICRPDA by failing to provide the plaintiff with a Reasonable Accommodation and continuously Refusing to Engage in the iInteractive Process.

315.   As a result, plaintiff has suffered and continues to suffer damages.

**Count 11:  Disability Discrimination: Hostile Work Environment in violation of the Rhode Island Civil Rights of People with Disabilities Act**

316.  Plaintiff Incorporates by reference the facts alleged in paragraphs 1-314 as though fully set forth herein.

317.  Defendant Brown violated the RICRPDA by subjecting the plaintiff to a Hostile Work Environment  because of (perceived symptoms) of plaintiff's disability.

318.  The Hostile Work Environment was severe and pervasive based on the nature of the harassment, including egregious mockery and ridicule of the plaintiff based upon symptoms of his Disability and constant and unwavering harassment and derogatory comments toward plaintiff based symptoms of his disability.

319.  Plaintiff considered the aforementioned conduct to be discriminatory and reported said discriminatory conduct, both verbally and in writing, to numerous management-level employees of the defendant, including (but not limited to) HR Director Ms. Sheila Coleman and "Civil Rights Investigator" Mr. Lawrence Angelo.

320.  Accordingly, the defendant was fully aware of a Hostile Work Environment. However, despite plaintiff's numerous complaints of Harassment and Unlawful Discrimination, defendant failed to adequtely investigate or otherwise cause the discriminatory conduct to cease.

321.  As a result, plaintiff has suffered and continues to suffer damages.

**Count 12: Disability Discrimination: Retaliation in violation of the Rhode Island Civil Rights of People with Disabilities Act ("RICRPDA")**

322.  Plaintiff Incorporates by reference the facts alleged in paragraphs 1-320 as though fully set forth herein.

323.  As described above, Defendant Brown did violate the RICRPDA by discriminating against plaintiff because he  opposed a practice forbidden by the RICRPDA (Harassment).

324.  After plaintiff made complaints and/or reports of Unlawful Harassment, plaintiff was subjected to additional Retaliatory Harassment.

325.  Defendant Brown made no effort to investigate plaintiff's complaints and/or

reports of Retaliatory Harassment.

326. As a result of defendants unlawful and egregious conduct, plaintiff has suffered and continues to suffer damages.

**Count 13: Failure to Provide Reasonable Accommodation in violation of the Rhode Island Fair Employment Practices Act ("FEPA", RI Gen. Laws 28-5-7 Section IV**

327. Plaintiff Incorporates by reference the facts alleged in paragraphs 1-326 as though fully set forth herein.

328. As described above, the actions of the defendant, through its agents, servants, and employees, in discriminating against plaintiff Mr. Pepper on the basis of his actual and/or perceived disability and/or record of impairment, in failing to provide a reasonable accommodation and/or refusing to make reasonable modifications for his disability violated FEPA/RI Gen. Laws 28-5-7 (Section IV).

329. As a result of defendants unlawful conduct described above, Plaintiff Mr. Pepper has suffered and continues to suffer damages as described above.

**Count 13: Hostile Work Environment in violation of the Rhode Island Fair Employment Practices Act RI general laws 28-5-7 (Section V)**

330. Plaintiff incorporates by reference the facts alleged in paragraphs 1-329 as though fully set forth herein.

331. Defendant violated FEPA/RI Gen. Law 28-5-7 (Section V) by subjecting plaintiff to a Hostile Work Environment on the basis of his disability.

332. The Hostile Work Environment was severe and pervasive based on the nature of the harassment, including egregious mockery and ridicule of the plaintiff based upon

symptoms of his Disability and constant and unwavering harassment and derogatory comments toward plaintiff based symptoms of his disability.

333.  Defendant also violated FEPA?RI Gen. Law 28-5-7 (Section V) by failing to adequately investigate and/or remedy aforesaid discriminatory conduct and *by failing and/or refusing to disclose in a timely manner in writing to that employee the disposition of the complaint, including a description of any action taken in resolution of the complaint.*

334.  As a result of Defendant Brown's Unlawful Conduct, Plaintiff has suffered and continues to suffer damages as described above.

**Count 14: Disability Discrimination: Retaliation in violation of the Rhode Island Employment Practices Act FEPA/RI Gen laws 28-5-7 (Section V)**

334.  Plaintiff incorporates by reference the facts alleged in paragraphs 1-335 as though fully set forth herein.

336.  RI Gen Laws 28-5-7 also explicitly states that it shall be an Unlawful Employment Practice: *(5) For any employer or employment agency, labor organization, placement service, training school or center, or any other employee referring source to discriminate in any manner against any individual because he or she has opposed any practice forbidden by this chapter, or because he or she has made a charge, testified, or assisted in any manner in any investigation, proceeding, or hearing under this chapter.*

337.  By failing and/or refusing to correct the Hostile Work Environment, Defendant Brown Unlawfully Retaliated against the plaintiff and violated FEPA/RI Gen. Law 28-5-7. As a result the harassment persisted and escalated as described above.

338.  As a result of defendants Unlawful Conduct, plaintiff has suffered and will conute to suffer damages.

**Count 15: Disparate Treatment in Violation of FEPA/RI Gen. Laws 28-5-7**

339.  Plaintiff incorporates by reference the facts alleged in paragraphs 1-338 as though fully set forth herein.

340.  FEPA/ RI Gen. Law 28-5-7 also makes it an Unlawful Employment Practice for an employer to: *discriminate in any manner against (a disbaled employee) with respect to his or her hire, tenure, compensation, terms, conditions or privileges of employment, or any other matter directly or indirectly related to membership or employment, whether or not authorized or required by the constitution or bylaws of the labor organization or by a collective labor agreement or other contract.*

341.  Brown violated RI Gen Laws 28-5-7 by discriminating against plaintiff Mr. Pepper on the basis of his disability with respect to *"terms, conditions, and/or privileges of employment"* by subjecting him to derogatory and disparate treatment, Unequal Discipline, and Biased/Selective Policy Enforcement as described above.

342.  Brown  subjected plaintiff to Disparate Treatment when Brown violated, breached and/or failed to adhere to several of its own policies, including (but not limited to), Brown's Anti Discrimaniton/Harassment, Non Retaliation and  Reasonable Accommodation Policies and procedures, as described above.

343.  Brown also breached its contract with the United States Government and/or Office of Federal Contract Compliance Programs (OFCCP) by failing to adhere to the requirements set forth in **Brown's Affirmative Action Plan.**

349.  As a result Mr. Pepper did suffer harm and/or harm to his reputation and continues to suffer damages to this day.

**Prayer for Relief and Demand Trial by Jury**

Wherefore plaintiff prays that this honorable court

a.  Enter judgment in his favor against the defendants

b.  Award with actual damages, Compensatory/Emotional Distress Damages, and Punitive Damages

c.  Order defendants to cease and desist from Unlawful Discriminatory employment patterns and practices

d.   Order defendants staff to undergo training on all applicable Reasonable Accommodation/ Disability/Anti Harassment/Anti Discrimination/Non Retaliaiton Fedral and State Statutes and regulations to ensure future compliance

e.  Amend plaintiff's Personal file to reflect neutral reference

f.   Award litigation costs/expenses

g.  Order defendants to declare that they have discriminated against plaintiff in violation of the aforesaid Statutes and regulations

h.  Award any other relief that this court deems just and fair

i.   *The plaintiff further requests and demands a trial by jury for all claims so triable.*

Respectfully submitted by:  *Nicholas S. Pepper Pro se*

Nicholas J. Pepper, *Pro Se*
31 Wright Street
North Providence, RI 02911
nickthenerdpeppermma@gmail.com
401-649-6609